RUBÉN MARTÍNEZ RODRÍGUEZ, conocido por GALLEGO, peticionario, v. GERARDO DELGADO, ETC., demandado.

Número: HC-64-21        Resuelto: 30 de junio de 1965

630

*López Carrillo & Cruz,* abogados del peticionario; *J. B. Fernández Badillo, Procurador General,* y *J. F. Rodríguez Rivera, Procurador General Auxiliar,* abogados del demandado.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Una ley del Estado de California, *West's Ann. Health & Safety Code* § 11721 (ed. 1964), declaraba delito público que aparejaba cárcel, el ser adicto al uso de drogas narcóticas.

Demostrado que la persona era un adicto al uso de drogas, infringía la ley sin necesidad de establecer actos específicos, como uso, posesión o transportación. Se impugnó su validez constitucional. En *Robinson* v. *California,* 370 U.S. 660 (1962), el Tribunal Supremo de los Estados Unidos considerando que el ser adicto al uso de drogas narcóticas aparentemente es una enfermendad, resolvió que constituía castigo cruel e inusitado y por tanto prohibido por la Octava Enmienda, el castigar criminalmente a una persona por el mero hecho de ser un adicto.

Invocando el citado dictamen el peticionario nos pide que lo excarcelemos.[1] Veamos su razonamiento. Fue acusado el 17 de mayo de 1961 de tener en su posesión y dominio la droga narcótica conocida como marihuana.[2] Se celebró el juicio y no presentó prueba en su defensa. El 15 de septiembre siguiente fue condenado a cumplir una sentencia de seis a diez años de presidio. Tres años más tarde, el 23 de septiembre de 1964 solicita su excarcelación alegando que es un adicto "que padece de una enfermedad que se caracteriza por una compulsión incontrolable para el uso de drogas y que en vista de ello, tanto el juicio como la sentencia son nulos e ineficaces en derecho ya que nunca pudo ni puede establecerse un delito sin que exista intención criminal y que su condena equivaldría a enjuiciar o condenar a una persona

---

[1] El peticionario previamente había sido convicto en la Corte de Distrito Federal para el Distrito de Puerto Rico por un delito de venta de drogas y estaba disfrutando de libertad condicional.

[2] La disposición infringida es la siguiente:

"Queda absolutamente prohibida la tenencia, posesión, traspaso, uso, aplicación, prescripción, manufactura, preparación o cualquier transferencia o recibo, así como la introducción, la ocultación y la transportación en Puerto Rico de:

"(1) . . .

"(2) . . .

"(3) La droga conocida como marihuana, así como cualquier mezcla líquida o sólida incluyendo cigarrillo o cigarros sin importar su forma y naturaleza, que contenga cualquier parte o residuo de marihuana. . . ." (24 L.P.R.A. sec. 974z.)

porque padezca de cáncer o tuberculosis". Cita entonces del caso de *Robinson* lo siguiente:

"No es probable que algún Estado en este momento de la historia intente convertir en delito el hecho de que una persona está mentalmente enferma o que sea un leproso o que padezca de una enfermedad venérea. Puede ser que un Estado determine que la salud y el bienestar general requieran que las víctimas de éstas y otras aflicciones humanas sean curadas mediante tratamiento compulsorio, que envuelva cuarentena, restricción o reclusión. Pero a la luz del conocimiento humano contemporáneo, una ley que convierta en delito el padecer tal enfermedad sería, sin lugar a dudas, universalmente considerada como una que impone un castigo cruel e inusitado en violación de las Enmiendas Octava y Décimocuarta."

El Estado alega que el peticionario no demostró en el juicio que se le siguió que fuera un adicto. *Robinson* no estableció cuándo es que el uso habitual de narcóticos se convierte en enfermedad. Nota, 111 U. Pa. L. Rev. 122, 124 (1962). Pero asumiremos que el peticionario estableció que es un enfermo.(³)

■ Si bien es verdad que *Robinson* resolvió que constituye castigo cruel e inusitado imponerle una pena de reclusión en virtud de sentencia en un caso criminal a un adicto al uso de drogas narcóticas por el solo hecho de serlo, es asimismo cierto que el Tribunal dejó claramente sentado que un "[e]stado puede imponer sanciones criminales, por ejemplo, contra la manufactura, prescripción, venta, compra o posesión sin autorización de narcóticos dentro de su territorio". Y al considerar la cuestión hace claro que "[e]ste estatuto no es uno que castiga a una persona por uso de narcóti-

---

(³) En la vista del hábeas corpus el peticionario declaró que era adicto al uso de drogas narcóticas; que le hacía falta el uso de las drogas. Además hubo prueba de que estaba recibiendo tratamiento grupal en el presidio. La declaración del Dr. Fernández Marina se circunscribió a exponer en términos generales la sintomatología del adicto. No examinó al peticionario. *Quaere* si lo apuntado es suficiente para establecer la condición de adicto como "enfermedad".

cos, por su compra, venta, o posesión, o por la conducta anti-social o desordenada que puede producir dicho uso. . . . Más bien, estamos tratando con una ley que hace del 'status' del adicto a narcóticos un delito, por el cual el infractor puede ser enjuiciado 'en cualquier momento antes de que se reforme'." Y al terminar el dictamen mayoritario afirma:

"Estamos conscientes de que los viciosos males del tráfico de narcóticos han ocasionado grave preocupación al gobierno. Existen, como hemos dicho, un sinnúmero de maneras de atacar legítimamente estos males. En este caso sólo nos ocupa una disposición individual de una ley local particularizada según ésta ha sido interpretada por los tribunales de California hasta el presente."

Así, en *Robinson* se hizo claro que lo que repugnaba a la garantía constitucional enmarcada en la Octava Enmienda, era imponer un castigo criminal a una persona por el sólo hecho de ser un adicto. Se estaba castigando no por una "actuación" sino por un "estado". Al considerar la cuestión el tribunal recalcó que el Estado podía utilizar diversos medios para controlar el tráfico y uso de drogas. Podía castigar el poseer la droga. El venderla; el comprarla. Y otras actividades relacionadas con el tráfico de estupefacientes.

■ El peticionario interpreta a *Robinson* como que sostiene que constituye castigo cruel e inusitado imponerle una pena de cárcel a un adicto por poseer una droga narcótica. Eso no lo resuelve *Robinson*. El Tribunal hizo claro que no lo resolvía. Expresó a la página 664 que "un Estado puede imponer sanciones criminales, por ejemplo, contra la manufactura, prescripción, venta, compra o posesión sin autorización de narcóticos dentro de su territorio".

■ Nada hay en el dictamen que sostenga "que el hecho de ser un adicto a drogas, puede ser una defensa válida en favor del adicto cuando se sorprenda a éste haciendo 'uso, poseyendo o transportando' una droga, si dichas operaciones resultan incidentales a su propio uso".

Esa no es la interpretación que se le ha dado a *Robinson* por los tribunales de otras jurisdicciones donde rigen estatutos como el nuestro. En cuanto a los comentarios en torno al dictamen la mayoría coincide con la interpretación que le han dado los tribunales. Algunos apuntan que es lógico y razonable extender la doctrina a actos específicos al efecto de que constituye castigo cruel e inusitado condenar criminalmente a un adicto por usar o poseer drogas narcóticas. Primero examinaremos la jurisprudencia; luego los comentarios.

El 30 de junio de 1964 la Corte Suprema de Wisconsin emitió un fallo en *Browne* v. *State,* 129 N.W.2d 175 que fue ratificado seis meses después en *State* v. *Brown,* 130 N.W.2d 760. Se atacaba la constitucionalidad de un estatuto que penalizaba el hacer uso de drogas sin mediar prescripción médica. La acusación se basó en que usó droga sin que le hubiera sido recetada. Invocó a *Robinson* y levantó la defensa de que era un adicto. El tribunal sostuvo la validez del estatuto y confirmó la sentencia que le condenó a una pena máxima de cinco años. Al resolver expresó:

" . . . Robinson es claramente distinguible. El estatuto de California que fuera declarado inconstitucional convertía en delito el ser un adicto a drogas. Robinson llegó a California de Oregón y fue acusado de la situación delictiva de ser un adicto al uso de narcóticos. No se le acusó, ni se presentó evidencia, de incidente alguno relativo al uso de drogas en California o algún otro lugar . . . .

"Robinson no invalida ningún estatuto de un Estado . . . que convierta en un delito el que una persona, sea un adicto o no, use drogas narcóticas sin autorización. En el presente caso Browne no fue acusado de ser un adicto sino del acto específico de usar drogas sin autorización."

En *Salas* v. *State,* 365 S.W.2d 174 (1963) la Corte de Apelaciones Criminales del Estado de Texas se presenta otra variante de la cuestión que estudiamos. El estatuto hace un delito de (1) usar habitualmente drogas narcóticas, de

(2) ser un adicto y de (3) estar bajo la influencia de drogas narcóticas. Salas fue acusado de estar bajo la influencia de drogas narcóticas. Atacó la constitucionalidad del estatuto a la luz de lo resuelto en *Robinson*. El tribunal resuelve que ciertamente aquella parte del estatuto que castiga el ser adicto es inconstitucional. Posteriormente ratificó este criterio en *Ex Parte Rogers*, 366 S.W.2d 559 (1963) y en *Martínez* v. *State*, 373 S.W.2d 246 (1963), pero sostienen el resto del estatuto. Concluyen que estar bajo la influencia de drogas narcóticas es un acto, el que puede ser castigado criminalmente. El acusado recurrió al Tribunal Supremo de los Estados Unidos y su caso fue desestimado por carecer de una cuestión federal sustancial. *Salas* v. *Texas*, 375 U.S. 15 (1963).

En el caso de *Martínez* la Corte de Texas expresa luego de invocársele a *Robinson*, lo siguiente:

"Los casos citados no ofrecen autoridad para invalidar el estatuto que dispone la prisión perpetua como castigo máximo a la posesión ilegal de una droga narcótica."

En *State* v. *Margo*, 191 A.2d 43 (1963) la Corte Suprema de Nueva Jersey tuvo ante sí la misma cuestión planteada en el caso de Salas que acabamos de considerar. Al resolverla se expresó así:

"Este estatuto no castiga la compulsión incontrolable hacia el uso de drogas. En vez, denuncia la situación de estar bajo sus efectos. Como hemos dicho, el estatuto trata sobre los efectos de los narcóticos para obviar el 'issue' de si la droga fue usada aquí o en otra jurisdicción. No vemos razón por la cual, si una persona puede constitucionalmente ser castigada por usar una droga no pueda ser castigada por estar bajo sus 'efectos', ya que en realidad el uso de drogas ofende los intereses sociales precisamente por su influencia maligna sobre la persona y los perjuicios a que esa influencia puede conducir. En otras palabras, el estar bajo los efectos de la droga es de por sí conducta antisocial. No es una disposición latente o pasiva; es un estado activo, voluntariamente inducido y cargado de una presente

capacidad de daño adicional a la sociedad. Opinamos que la sociedad puede hacer uso del proceso criminal para protegerse a sí misma de estos males. Robinson no es contrario."

La Corte de Apelaciones de Maryland en *Murray* v. *State*, 203 A.2d 908 (1964) consideró otra fase de la cuestión. Murray fue acusado de poseer narcóticos. Fundándose en *Robinson* ofreció prueba médica para establecer que la adicción es una enfermedad y fue rechazada. En apelación se sostuvo el tribunal de instancia. A continuación la expresión del Tribunal:

"En Maryland la adicción a narcóticos no es un delito, y el acusado no fue procesado por ser un adicto. En vez, fue juzgado y condenado por la violación del Art. 27, sec. 277 del Código (1957), que prohibe a una persona manufacturar, poseer, controlar, vender, recetar, administrar, suministrar o mezclar cualquier droga narcótica a menos que esté autorizado por ley para ello, y es por poseer y controlar narcóticos que el acusado es castigado. Aunque el estatuto de reincidencia, Art. 27, sec. 300, del Código (1964 Supl.) se aplica a adictos y no adictos por igual, no impone, como el acusado alega, castigo por ser un adicto. Además, a pesar de la aparente elección del acusado a ignorarlo, la ley dispone para el tratamiento, cuidado y reclusión de una persona acusada de la comisión de una ofensa criminal 'quien es habitualmente adicto al uso de drogas narcóticas según el término se define en la sec. 276 del Art. 27 del Código (1964 Supl.),' Art. 16, sec. 49. Este estatuto no hace de la adicción a narcóticos un delito, ni es de naturaleza punitiva.

"El caso de Robinson, sosteniendo que un estatuto de California que castigaba a una persona por la adicción a drogas violaba la garantía constitucional contra castigos crueles e inusitados es claramente distinguible del presente caso. Allí el estatuto envuelto específicamente hacía ilegal el que una persona fuere adicta al uso de drogas narcóticas. En Maryland, como hemos visto, no existe un estatuto que convierta la adicción en delito."

El acusado en *State* v. *DaVila*, 183 A.2d 852 (Conn. 1962) fue convicto de tener en su posesión una droga narcótica: heroína. Admitió que era un adicto y que compraba la

droga para su propio uso. El Estado presentó evidencia al efecto que el acusado vino en contacto con un tal Leach, en compañía de quien fumaba marihuana. Hablaron de narcóticos y el acusado le ofreció venderla a Leach, quien le informó que tenía un amigo que seguramente estaría interesado. El acusado le informó a Leach que iría a Nueva York a comprar la droga y que dispondrían de ella a través del amigo de Leach. Al otro día el acusado regresó con diez saquitos de heroína y se encontró, previo acuerdo, con Leach en su apartamiento. Entonces fueron a un automóvil. Luego de ser presentado vendió 9 saquitos a un hombre que resultó ser un agente federal. El acusado no quiso vender el saquito que le quedaba ya que lo quería para un amigo. El acusado admite lo anterior pero alega que fue inducido a ello por Leach y que el saquito que se reservó era para su propio uso.

El acusado solicitó del tribunal de instancia que instruyera al jurado en el sentido de que si llegaba a la conclusión que poseía la droga con el objeto de usarla él mismo por ser adicto, el jurado debía hacerlo constar así en su veredicto. La corte no transmitió la instrucción. En apelación se resuelve que estuvo correcta.

El estatuto de Connecticut provee que " . . . ninguna persona podrá manufacturar, poseer, controlar, vender, recetar, suministrar, mezclar o administrar a sí mismo u otra persona, o ser adicto al uso de drogas narcóticas. . .".

Al resolver que estuvo correcto el tribunal al negar la instrucción solicitada la corte expresa que la ley no distingue "entre la posesión y control de la droga para la venta y posesión o control para la auto-administración o por otro que sea adicto. Una persona que tiene la droga en su posesión o bajo su control para algún otro propósito que el legal según éste se establece en la ley uniforme será culpable de un delito".

La Corte Suprema de Luisiana se enfrentó al problema que presenta el dictamen de *Robinson* sosteniendo que "[y]a

que el uso habitual de narcóticos según éste es denunciado por el estatuto de Luisiana necesariamente comprende una serie de actos perpetrados intencional o voluntariamente nuestra ley no puede ni podría ser de aplicación en un procedimiento contra una persona por el mero estado o condición de adicto que podría, como se señala en las distintas opiniones del caso de *Robinson,* resultar inintencional o involuntaria. Y en vista de que la decisión federal declaró al estatuto de California inválido únicamente por esta posibilidad su ·dictamen no controla, ni es relevante, en la determinación de la constitucionalidad de L.R.S. 40:962(A) bajo la cual los peticionarios fueron acusados". *State* v. *Walker,* 154 So.2d 368 (1963) *cert. den.* 375 U.S. 988 (1964). Y en *State* v. *James,* 169 So.2d 89 (1964) sostiene que como al acusado no se le procesó por ser adicto y sí por poseer morfina, no puede impugnar la constitucionalidad de aquella parte del estatuto que trata sobre la adicción.

En *People* v. *Davis,* 188 N.E.2d 225 (Ill. 1963) se interpretó un estatuto similar al de California. Y el Tribunal Supremo de Illinois siguiendo a *Robinson* resolvió que era inconstitucional condenar a una persona por adicto.

Igual ocurrió en *State* v. *Bridges,* 360 S.W.2d 648 (Mo. 1962). La Corte Suprema de Missouri resolvió que la disposición legal que penalizaba "to be or become addicted to any narcotic drug" adolecía del mismo defecto del estatuto interpretado en *Robinson.*

El 21 de abril pasado la Corte de Apelaciones para el Segundo Circuito falló en *United States* v. *Reincke,* 344 F.2d 260. Un convicto de uso de drogas solicitó un hábeas corpus alegando que siendo adicto constituía castigo cruel e inusitado el condenarlo criminalmente por usar drogas. Invocó a *Robinson.* Al denegar el auto el Tribunal expuso que en *Robinson*:

"La Corte reconoció 'los amplios poderes de un Estado para reglamentar el tráfico de drogas narcóticas dentro de su terri-

torio', confirmó el poder de un Estado para 'imponer sanciones criminales' contra 'la posesión de narcóticos sin autorización dentro de su territorio', 370 U.S. 664—sin hacer una excepción para los adictos—y enfatizó que estaban tratando 'sólo con una disposición individual de una ley local particularizada según ésta ha sido interpretada por los tribunales de California hasta el presente'. 370 U.S. 668."

Pasemos ahora a examinar los comentarios que se han publicado en relación con *Robinson*. En una nota que aparece en 12 Buffalo L. Rev. 605 se expresa lo siguiente a la pág. 620:

"La opinión disidente del Juez White ha tocado, sin embargo, sobre un punto que seguramente se le presentará al tribunal para futura consideración y quizás para la eventual extensión del alcance de la presente decisión. Es sencillamente lo siguiente: si un Estado no puede castigar por el estado o condición de adicto a drogas, ¿cuán consistente con la censura de la Octava Enmienda pueden ser aquellos estatutos que prohiben el uso de drogas? Es evidente que un adicto usa drogas porque es adicto a su uso. Por esta misma razón él poseerá narcóticos así como los instrumentos para su uso y podría quizás hasta vender narcóticos a otros adictos para mantener su propio hábito. El usará, poseerá y venderá narcóticos únicamente porque es adicto a ellas, porque tiene la condición de ser un adicto, un estado o condición que no puede ser castigado.

"Bastaría decir que todos estos elementos son separables y que la inhabilidad de los Estados para proscribir constitucionalmente el estado de adicto a drogas, no afectará la constitucionalidad de sus incidentes."

En 42 Neb. L. Rev. 685–691 (1962) se hace claro que *Robinson* "levantó, pero no resolvió la cuestión de si una persona podría ser convicta por el uso de narcóticos".

En el estudio que anualmente se hace de las decisiones del Tribunal Supremo en Harv. L. Rev. aparece el siguiente comentario sobre *Robinson* en el Vol. 76 a la pág. 143 y siguientes:

" . . . La mayoría enfatizó que la decisión no excluía el castigo por los delitos relacionados de 'manufactura, prescripción, venta,

compra o posesión de narcóticos sin autorización' o reclusión civil compulsoria de adictos para tratamiento.

"· . . . . . . . . .

" . . . Sin embargo, como apunta el Juez White, la opinión de la mayoría parece asumir en términos amplios que cualquier persona habituada al uso de drogas, la definición de adicto del tribunal sentenciador, es necesariamente un adicto en sentido médico, quien actúa bajo compulsiones físicas y sicológicas. Como también apunta él, el catálogo que hace la mayoría de actos que un Estado, puede constitucionalmente castigar no incluyó el uso de narcóticos. Mientras esta lista no era claramente exhaustiva, la distinción entre penalidades por el uso y penalidades por adicción parece tenue, cuando menos donde la adicción se reputa no más como el uso habitual. La diferencia principal parece ser el grado de particularidad requerido en la acusación y la prueba necesaria sobre materias como la fecha y sitio del uso. Además, aún si la opinión de la mayoría no requiere la eliminación del uso como delito separado, es por lo menos debatible que indica que a un acusado debe permitírsele interponer la adicción como defensa a una acusación por su uso, ya que de otra manera el Estado parecería estar castigando la adicción indirectamente. Lo mismo podría ser cierto a veces sobre el delito de posesión ilegal. El que la opinión de la mayoría tuviere la intención de ir tan lejos, sin embargo, parece dudoso, ya que el Juez Stewart enfatizó que el presente caso no se considera que implicaba castigo hacia acto antisocial alguno. El Juez Harlan también recalcó la distinción entre un acto y una condición o estado como la base para sanciones criminales—una distinción que otros han pensado como constitucionalmente significativa. La adopción de tal análisis podría arrojar dudas sobre la constitucionalidad de numerosos estatutos prohibiendo tales 'delitos de condición personal' como el vagabundaje, que en muchas jurisdicciones es castigable con prueba de que el acusado era persona 'ociosa' o 'disoluta', en vez de prueba de conducta antisocial específica.

"La decisión parece al menos impedir el procesamiento cuando el Estado no es capaz de probar algún hecho específico de uso o posesión de narcóticos dentro de su territorio."

En la Nota comentando a *Robinson* que aparece en 37 Tul. L. Rev. 119, 121 (1962) se expresa:

"No obstante la opinión del presente caso, el adicto permanece fuera de la ley para todos los efectos prácticos. Usando, poseyendo o comprando narcóticos se compromete en actividades extra legales."

Y en el que aparece en 47 Minn. L. Rev. 484, 493 (1963) se afirma:

"Si el Tribunal está dispuesto a conceder la condición de inmunidad por adicción a base de su semejanza con las enfermedades mentales, no parece haber razón lógica por la cual esa semejanza no deba también reconocerse a los efectos de concederle inmunidad a un adicto de ser procesado por actos incidentales a su condición. De manera que el razonamiento del Tribunal sugiere que la condición de adicción a narcóticos debe reconocerse como una defensa afirmativa en acciones criminales por actos incidentales a esa condición."

En la Nota publicada en 16 Vand. L. Rev. 214, 218 (1962) se comenta:

"Aunque el Tribunal limitó su dictamen a aquellos estatutos que hacían de la condición del adicto una ofensa criminal, su apoyo en la octava enmienda tiende a ampliar los efectos de su dictamen para incluir estatutos que someten al adicto a acciones criminales por un acto indispensable a su condición. El uso de la octava enmienda levanta la cuestión de si sería menos cruel e inusitado que se encarcelara a un adicto por adquirir, poseer o usar narcóticos. La lógica dicta una respuesta negativa."

En 41 Texas L. Rev. 444, 446 (1963) se afirma que "si la prohibición constitucional al castigo cruel e inusitado excluye el tratar a un adicto como un criminal, entonces no hace sentido el que se permita a los Estados tratar como criminal la conducta de un adicto que es solamente sintomática de su enfermedad".

En un artículo titulado *Implications of Robinson* v. *California*, 1 Houston L. Rev. 1, 7 (1963) se estudia el dictamen así como otros de cortes estatales especialmente *State* v. *DaVila*, de la Corte Suprema de Connecticut y que arriba citamos. Sobre ellos concluye que "aunque la decisión del

caso de *Robinson* no obliga a resultados concretos, y la decisión de la Corte de Connecticut parece ser indebidamente restrictiva, puede sugerirse con cierta confianza que la ley será en sentido de que un adicto no podrá ser encarcelado por delitos de condición narcótica".

Entiende el autor que *Robinson* trae como consecuencia que "cuando un adicto viola la ley de narcóticos mediante la adquisición, uso o posesión de la droga para mantener su hábito, el Estado no puede imponerle una sentencia de cárcel".

■ Así vemos que las cortes unánimemente han interpretado a *Robinson* en el sentido de que se puede imponer una sanción criminal a un adicto si comete uno de los actos prohibidos por la ley.

Ahora bien, el criterio de los que han comentado la decisión, tanto los estudiantes que redactan las notas, como los que la comentan más profundamente es diverso. Unos expresan estar de acuerdo con el razonamiento de la opinión al efecto de que el Estado puede castigar criminalmente a un adicto por usar, poseer, etc., la droga narcótica. Otros, admiten que ése es el tenor de la decisión, pero que no es ni lógico ni razonable. Otros sostienen que el resultado final del dictamen es que no proceden las sanciones penales a un adicto por poseer o usar drogas.

■ Si puede sostenerse la validez constitucional de una disposición penal que trata sobre un problema de profundo impacto social, sobre el cual hay diversidad de criterios en cuanto a la forma más sabia de afrontarlo, es obligación nuestra sostenerla. No debemos tratar de imponer nuestra particular predilección de cómo resolverlo.

Podemos no estar de acuerdo con esa forma de compatir el problema que presenta para la sociedad el tráfico ilegal de drogas narcóticas. Los que han estudiado el problema, los que tienen conocimiento profundo del comportamiento del adicto no han podido ponerse de acuerdo sobre cuál es el

mejor método. Como expresó el Dr. Fernández Marina durante la vista del presente caso cuando se le preguntó si el adicto debía ser tratado "como delincuente o tratado como paciente":

"En todo momento es un paciente y como, claro aquí hay dos puntos de vista que hay que aunar, es el punto de vista de proteger la sociedad de un delincuente y desde el punto de vista de la medicina de tratar un paciente. El problema no está resuelto en ningún sitio."

En el caso de *Reincke* antes citado se expresa que:

"Estamos conscientes de la seria diferencia de opinión que existe concerniente a la sabiduría de legislación antinarcótica tan severa como la de Connecticut . . . . Pero la misma ausencia de una solución generalmente aceptada milita en contra de la intervención judicial mas bien que a favor".

■ Además nuestro estatuto no está redactado como el que fue considerado en *Robinson*. El nuestro sigue el modelo uniforme, adoptado en casi todas las jurisdicciones estatales. Es uno científico, abarcador con penalidades para ciertos actos pero a la vez con disposiciones para enfrentarse al problema de los enfermos adictos. No hace un delito del ser adicto.

■ El propio peticionario declaró a pesar de haber sido condenado criminalmente que está recibiendo tratamiento siquiátrico grupal en el presidio. Evidentemente el Estado no lo ha tratado como un criminal corriente. Aprovecha su encarcelamiento para curar su enfermedad. La ley además dispone para el tratamiento de aquellas personas que se sometan voluntariamente a tratamiento. Éstos no los considera delincuentes. 24 L.P.R.A. sec. 976 (*l*).

*Se declarará sin lugar el hábeas corpus solicitado.*

El Juez Asociado Señor Belaval disintió en opinión en la cual concurren el Señor Juez Presidente Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Santana Becerra. El Juez Asociado Señor Santana Becerra emitió

un voto separado en el cual concurren también el Señor Juez Presidente y los Jueces Asociados Señores Belaval y Hernández Matos.

—o—

Opinión disidente del Juez Asociado Señor Belaval, con la cual concurren el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

San Juan, Puerto Rico, a 30 de junio de 1965

El peticionario Rubén Martínez Rodríguez, alega: (1) Que el día 15 de septiembre de 1961, el peticionario fue sentenciado por el Tribunal Superior de Puerto Rico, Sala de San Juan, a cumplir una sentencia de seis a diez años de presidio, con trabajos forzados por el uso de la droga narcótica marihuana, habiendo demostrado la prueba presentada en su contra durante el juicio que el peticionario era un adicto a las drogas; (2) que desde el ingreso del peticionario en la penitenciaría estatal, ha venido recibiendo tratamiento médico especial para su narcosis y ha sido incluido en y pertenece a los grupos de terapia organizados en dicha institución penal para la recuperación de los adictos a drogas; (3) que desde que ingresó en la Penitenciaría Estatal hasta el presente, el peticionario ha estado privado de su libertad, contra su voluntad y en violación de las disposiciones de la Ley de Narcóticos de Puerto Rico, que en su Art. 2—24 L.P.R.A. sec. 973a (26); pág. 240—define así el adicto a drogas: "Toda persona que use o consuma habitualmente cualquier clase de droga narcótica en tal forma que ponga en peligro la moral, salud, seguridad o bienestar públicos y la suya propia, o que tenga tan arraigado el hábito de usar dichas drogas que se encuentre imposibilitado para ejercer control sobre su persona en lo que a dicho hábito se refiere;" que el Art. 59 de la Ley de Narcóticos autoriza al Secretario de Salud de Puerto Rico a disponer todas las facili-

dades necesarias para el tratamiento de adictos a drogas nar-cóticas y el Art. 60 de la misma ley en su apartado (o) estatuye que: "Ninguna persona que sea sometida al tra-tamiento compulsorio que se autoriza en esta sección será considerada como un infractor de este capítulo y la orden del Tribunal ordenando su reclusión en una institución no se considerará, bajo ninguna circunstancia, como una convicción o sentencia criminal," y, el apartado (p) del mismo artículo provee para el tratamiento especial a los que voluntaria-mente se someten al Tribunal y añade que las personas que voluntariamente se recluyan estarán sujetas a las mismas obligaciones que se le impongan a las personas que compulso-riamente son recluidas en una institución bajo las disposi-ciones de esta sección.

Sigue alegando el peticionario que, tanto la prueba de su caso, como las alegaciones de la acusación demuestran que el peticionario es un narcómano, o sea, padece de una enferme-dad que se caracteriza por una compulsión incontrolable al uso de las drogas, y siendo esto así, tanto el juicio como la sentencia son nulos e ineficaces en derecho ya que nunca pudo ni puede establecerse un delito sin que exista intención cri-minal y que su condena equivaldría a enjuiciar o condenar a una persona porque padezca de cáncer o tuberculosis.

Por último alega que recientemente la Corte Suprema de Estados Unidos, revocó un caso de la Corte Suprema de California—*Robinson* v. *California*, 370 U.S. 660, 8 L.Ed.2d 758 (Stewart) (Douglas, concurrente) (1962) cita precisa a las págs. 666 U.S., 763 L.Ed.2d; 677–678 U.S., 769 L.Ed.2d, resolviendo: "No es probable que algún Estado en este mo-mento de la historia intente convertir en delito el hecho de que una persona esté mentalmente enferma o que sea un leproso o que padezca de una enfermedad venérea. Puede ser que un Estado determine que la salud y el bienestar general requieran que las víctimas de éstas y otras aflicciones huma-nas sean curadas mediante tratamiento compulsorio, que

envuelva cuarentena, restricción o reclusión. Pero a la luz del conocimiento humano contemporáneo, una ley que convierta en delito el padecer tal enfermedad sería, sin lugar a dudas, universalmente considerada, como una que impone un castigo cruel e inusitado en violación de las Enmiendas Octava y Decimocuarta. Véase *Louisiana ex rel Francis* v. *Resweber*, 329 U.S. 459, 91 L.Ed. 422, 67 S. Ct. 374. No tenemos más remedio que considerar el estatuto bajo nuestra consideración como de esta misma categoría (locura, lepra, enfermedad venérea). Ante este Tribunal, el Procurador del Estado admitió que la narcosis es una enfermedad." (Stewart.)

"Este proceso no tiene relación alguna con la curación de una enfermedad. En realidad, no puede tenerla, ya que está diseñada para penalizar una enfermedad en vez de proveer tratamiento médico para ella. Nosotros estaríamos olvidando las enseñanzas de la Octava Enmienda si permitiéramos que una enfermedad se convirtiera en un delito y que personas enfermas fueran castigadas por estar enfermas. El espíritu ilustrado de esta época no puede tolerar una acción tan bárbara." (Douglas.)

Son éstos los fundamentos de hecho y de derecho sobre los cuales se solicita la excarcelación del peticionario.

La acusación que se presentó en el Tribunal Superior de Puerto Rico, Sala de San Juan—Criminal Núm. G-61-548—dice así: "El Fiscal formula acusación contra Rubén Martínez Rodríguez, residente en Bloque N-6, Urbanización Las Lomas, Río Piedras, Puerto Rico, por una infracción al artículo 29 de la Ley de Narcóticos de Puerto Rico (felony) cometida de la manera siguiente: El referido acusado Rubén Martínez Rodríguez, allá en o para el día 29 de abril de 1961 y en San Juan, Puerto Rico, que forma parte del Tribunal Superior de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosa y criminalmente, tenía en su posesión y dominio la droga narcótica conocida como marihuana."

El Art. 29 de la Ley de Narcóticos de Puerto Rico—24 L.P.R.A. sec. 974z (pág. 254)—que es la disposición que se alega infringida, establece: "Queda absolutamente prohibida la tenencia, posesión, traspaso, uso, aplicación, prescripción, manufactura, preparación o cualquier transferencia o recibo, así como la introducción, la ocultación y la transportación en Puerto Rico de: (1) . . . (2) . . . (3) La droga conocida como marihuana, así como cualquier mezcla líquida o sólida incluyendo cigarrillo o cigarros sin importar su forma y naturaleza que contenga cualquier parte o residuo de marihuana. No estará comprendida en esta prohibición la fibra del tallo de esta planta, así como sus semillas esterilizadas para fines industriales y siempre que a dicha fibra se le haya extraído la substancia o resina que contiene esta droga y la esterilización de la semilla se haya logrado en grado tal que no pueda germinar."

La prueba que se presentó por el peticionario en la vista de este recurso, puede sintetizarse así: El peticionario declaró estar recluido en la Penitenciaría Estatal de Río Piedras desde el 15 de septiembre de 1961 por un delito de drogas narcóticas, y que cuando lo arrestaron por ese delito era un adicto a la marihuana, a fumar marihuana; que cuando lo arrestaron hacía exactamente cuatro meses que había salido de un hospital para adictos a drogas, en Fort Worth, Texas; que estuvo en ese hospital porque anteriormente lo habían procesado por un delito de venta de drogas en la Corte Federal de Puerto Rico (Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico); que cuando llegó al hospital después de estar en cuarentena le asignaron un trabajo de mecánico dental en la clínica dental del hospital; que daban reuniones en la galera (*wall meeting*) para orientarlos sobre lo que debían hacer; que después lo asignaron a un grupo de terapia grupal por muchísimo tiempo hasta que el doctor tuviera oportunidad de ver cómo había reaccionado el paciente; que al salir del hospital parece que

no había asimilado el tratamiento y volvió a usar las drogas cuando vivía en Las Lomas N-6, de Río Piedras; que un día salió de su casa y fue a un sitio llamado La Perla; a buscar la droga "para usarla porque me hacía falta"; que al ir a la Perla, vió al muchacho (el vendedor) y le compró un cigarrillo de marihuana; que se fue a la calle Lucila Silva a fumar su cigarrillo, y mientras estaba fumando lo sorprendió el Teniente Nuñez Ortiz y un Sargento; que al ver a dichos agentes, el peticionario se puso nervioso y botó lo que llevaba en la mano; que "entonces ellos me mandaron a parar; al mandarme a parar, pues, el Teniente le dijo al Sargento que me aguantara, entonces él personalmente caminó, como era de noche con un flashlight y regresó con un cigarrillo de mariguana ya prendido"; "que como tres cuartos de cigarrillo porque en esos momentos lo acababa de prender"; que ese cigarrillo lo volvió a ver en el juicio que se le celebró en el Tribunal Superior de Puerto Rico, Sala de San Juan; que durante el juicio el señor Teniente declaró "que ibamos cuatro personas a una distancia de 15 pies entonces íbamos fumando tres, los otros dos iban fumando cigarrillos regulares y yo [el peticionario] iba fumando mariguana"; que después del juicio lo ingresaron en la Cárcel del Paseo de la Princesa y a los seis días de estar allí lo ingresaron en la Penitenciaría Estatal de Río Piedras; que en dicha institución recibe tratamiento; un día en la semana el doctor Efrén Ramírez les da terapia grupal, un procedimiento que busca desde que el adicto es niño, cual ha sido el problema que lo ha llevado a usar la droga; que del grupo mayor que es de 250 adictos lo suben al de 40 adictos, y entonces del de 40 adictos lo suben al de 10 y "ya en el grupo de 10 pues ya uno se puede dar cuenta de cual ha sido el motivo de uno, cual ha sido la enfermedad que nos ha llevado a la droga. Entonces al tiempo de estar ahí en ese grupo [el grupo de 10] al ver como nosotros asimilamos el tratamiento buscan la manera de trasladarnos al Hospital de Psiquiatría"; que el peticionario per-

tenece al grupo grande, al de los 250 adictos, desde hace aproximadamente dos años; que el peticionario está usando drogas desde la edad de doce años; que en la actualidad no está usando drogas y no las usa desde hace dos años, desde que empezó la terapia grupal en la institución; que antes de empezar la terapia grupal usaba la droga; que no sabe como entra la droga en la cárcel pero al peticionario se le hacía fácil conseguirla dentro de la cárcel; que durante el período de tratamiento no ha vuelto a recaer.

El testimonio del ilustrado perito médico, doctor Ramón Fernández Marina, contiene una extensa y metódica exposición de la conducta interna del adicto a drogas. Intentaremos una síntesis de dicha exposición: El adicto a drogas puede tener diferentes tipos de personalidad, tanto física como psicológica, pero hay una cosa fundamental en todos ellos: la necesidad compulsiva de utilizar la droga, porque la ansiedad y el desasosiego físico que los domina, es de tal naturaleza, que no pueden tener ninguna otra alternativa que no sea la obtención y el inyectarse la droga. Esta compulsión, esta necesidad que obnubila cualquier otra consideración moral, social, familiar, legal, es única en la psiquiatría. Hasta donde se sabe en psiquiatría, infiriendo la conducta de un individuo de sus procesos mentales, un adicto a drogas no posee el juicio claro en la percepción de la realidad que le permitiera llevar a cabo un control adecuado de su conducta. Un individuo intervenido en su psicología y en su fisiología, primero, por la compulsividad de carácter psicológico y segundo, por la toxicidad de una droga, no puede tener control sobre las funciones psicológicas que determinan su conducta o rigen el control de sus actos sociales. El adicto a drogas ha regresado a un estado anterior de conciencia, o mejor dicho, se ha deteriorado en sus funciones psicológicas de tal manera que es como un niño. Es decir, lo que busca es su satisfacción, lo concretístico, lo que está regido por el principio del placer, contrario al adulto normal y razonable que

busca más allá de la satisfacción, su seguridad, ser aceptado por sus congéneres, por su sociedad. La conducta normal es aquélla dispuesta a sacrificar muchas satisfacciones por la seguridad de una posición firme ante la vida. El adicto a drogas, por el efecto de su enfermedad psicológica y por su estado tóxico fisiológico, no podría preferir su seguridad porque la necesidad que siente de salir del estado psicológico y fisiológico es tan urgente, que aún sabiendo que su seguridad peligra, antepone su satisfacción a dicha seguridad. Aunque pudiera distinguir entre el bien y el mal, siempre estaría compelido por la necesidad inaplazable de satisfacer su vicio. Como cuestión de realidad humana, y científica, el narcómano es un enfermo en todo momento, y es por eso que debe cambiarse por completo el enfoque de todo el problema. Considerarlo como un delincuente agrava el problema de su rehabilitación, quedan marcados con el sello de delincuentes y su deterioro moral es más rápido. Hablando sobre el aspecto de la propagación, el doctor Ramón Fernández Marina, informó, que la propagación ilegal de la droga es tan alarmante como la propagación de una epidemia, puesto que los incitadores (*pushers*) se dedican continuamente a hacer adictos, sobre todo entre la gente joven, para lucrarse de ellos más tarde. En cuanto al aspecto de la recuperación médica del narcómano, el ilustrado perito médico le informó al Tribunal que si el adicto a drogas se le rodea de una serie de circunstancias adecuadas, come bien y en caso de alguna enfermedad infecciosa interrecurrente se trata a su debido tiempo, puede durar hasta los sesenta años. Como al alcohólico habitual, lo que mata al adicto a drogas, es la falta de comida o de atención médica.

Examinados los fundamentos de hecho y de derecho del recurso ante nos, desde el punto de vista de nuestra ley local, procede ahora que consideremos además, con especial deferencia el fundamento constitucional del caso de *Robinson* v. *California* de la Corte Suprema de los Estados Unidos. La

disposición legislativa considerada en dicho caso es la Sec. 11721 del Código de Salud y Seguridad de California—40 *West's Annotated California Codes* 366 (1964)—que dispone: "Ninguna persona usará o estará bajo la influencia de narcóticos, excepto cuando estos sean administrados por o bajo la dirección de una persona autorizada por el Estado para recetar y administrar narcóticos. La defensa tendrá el peso de probar que el caso cae bajo la excepción. Cualquier persona convicta de violar cualquier disposición de esta sección será culpable de delito menos grave y será sentenciada a cumplir un término no menor de 90 días ni mayor de un año en la cárcel del Condado. La Corte podrá poner en probatoria a cualquier persona convicta bajo esta sección por un período que no excederá de cinco años y deberá requerir en todos los casos en que se conceda la probatoria, como condición a la misma, que tal persona sea confinada en la cárcel del Condado por un término no menor de 90 días. Bajo ninguna circunstancia tendrá el Tribunal el poder de eximir a una persona que viola esta sección de la obligación de permanecer confinado por lo menos 90 días en la cárcel del Condado."

Los hechos considerados por la Corte Suprema de los Estados Unidos fueron los siguientes: Lawrence Robinson fue acusado en la Corte Municipal de Los Ángeles por una infracción al estatuto de drogas de California arriba indicado por ser "un adicto al uso de narcóticos". La prueba en su contra consistió de la declaración de dos oficiales del orden público. El policía Brown declaró que él había tenido la oportunidad de examinar los brazos del apelante una noche, en una calle de Los Ángeles, como cuatro meses antes del juicio, y observó en dicho brazo cierto tejido cicatrizado, descolorido, en el brazo derecho del acusado y algo que parecía ser numerosas marcas producidas por una aguja y una costra que se encontraba aproximadamente a tres pulgadas debajo de la curvatura del codo en el brazo izquierdo del apelante. El poli-

cía declaró además que al interrogar al acusado, éste le había admitido que en algunas ocasiones usaba narcóticos. El policía Lindquist declaró que él había examinado al acusado a la mañana siguiente en la Cárcel Central de Los Ángeles y había observado también las partes descoloridas y las costras en los brazos del acusado, identificando ciertas fotografías de los brazos del acusado tomadas poco tiempo después de su arresto en la noche anterior. Basándose en su experiencia de más de diez años, como oficial de la División de Narcóticos del Departamento de la Policía de Los Ángeles, el testigo declaró que las marcas y la decoloración que aparecían en el brazo del acusado eran el resultado de inyectarse narcóticos dentro del tejido y la vena usando agujas hipodérmicas sin esterilizar; el segundo testigo declaró además que las costras se habían formado varios días antes del testigo examinar el brazo del acusado y que dicho acusado no estaba bajo la influencia de narcóticos ni sufría de síntomas propios del adicto que se encuentra privado del uso de la droga. El policía Lindquist declaró también que el acusado le admitió haber usado narcóticos en el pasado.

Declarando en su propia defensa, el acusado negó haber hablado con los oficiales de la policía y negó asimismo que alguna vez él hubiese usado narcóticos o que fuese un adicto a su uso. Explicó que las marcas en sus brazos se debían a una condición alérgica contraída durante su servicio en el ejército. Su testimonio fue corroborado por dos testigos.

El Juez de hechos instruyó al jurado que el estatuto consideraba un delito menos grave, cometido por una persona, lo mismo el uso de un narcótico que el ser "un adicto al uso de narcóticos"; que la parte del estatuto que se refiere al "uso" se basa en el "acto" de usarlo y la parte del estatuto que se refiere a ser "un adicto al uso de narcóticos" se refiere a una condición o "*status*"; que el "uso" o "el ser adicto" no son términos idénticos o equivalentes en significado; que ser un adicto al uso de narcóticos determina un

"*status*" o condición, no un acto. Que el *status* de ser un adicto al uso de narcóticos es una infracción continua y se diferencia de la mayor parte de las otras infracciones, en ser más crónica que aguda; continúa después de haberse realizado en su totalidad y deja al infractor sujeto a arresto en cualquier momento antes que logre reformarse. La existencia de dicha condición crónica se determina por un simple examen, si las reacciones peculiares de dicha condición pueden observarse al momento del examen. El Juez además le dio instrucciones al jurado, en el sentido, que el acusado podía ser declarado culpable bajo un veredicto general lo mismo en caso que el jurado concluyera, que como una cuestión de "*status*" el acusado era un adicto al uso de drogas, o que había cometido el "acto" declarado ilegal por el estatuto.

Resolviendo la cuestión de última instancia sometida, la Corte Suprema de Estados Unidos se expreso así: "El amplio poder de un Estado para regular el tráfico de drogas narcóticas dentro de su territorio no está en discusión. Hace más de cuarenta años en el caso de *Minnesota ex rel. Whipple* v. *Martinson*, 256 U.S. 41, 65 L.Ed. 819, 41 S.Ct. 425, este Tribunal explícitamente reconoció la validez de dicho poder. 'No puede dudarse de la autoridad del Estado, en el ejercicio de su poder público, para regular la administración, venta, prescripción y uso de drogas peligrosas y capaces de crear hábito. El derecho a ejercitar este poder es tan evidente, que ante el interés de la salud pública y el bienestar de la comunidad, basta con decir que un principio tan firmemente establecido no puede cuestionarse con algún éxito.' Este poder de regular, se da por pre-establecido y es susceptible de adoptar una variedad de formas. El Estado puede imponer sanciones criminales, por ejemplo, contra la manufactura, prescripción, venta, compra o posesión sin autorización de narcóticos dentro de su territorio. Para desalentar la violación de dichas disposiciones, o en beneficio de la salud general o el bienestar común de sus habitantes, el Estado puede establecer un pro-

grama de tratamiento [médico] compulsivo para aquéllos que sean adictos al uso de narcóticos. Este programa curativo puede exigir períodos de confinamiento involuntario y ciertas sanciones penales pueden imponerse por dejar de cumplir con los procedimientos establecidos para el tratamiento compulsivo . . . o el Estado puede también optar por atacar los males del tráfico de narcóticos en otras áreas más anchas, a través de la educación sobre la salud pública, por ejemplo, o por esfuerzos dirigidos a mejorar las condiciones económicas y sociales bajo las cuales se puede pensar que estos males florecen. En resumen, el alcance de selección válida que está a disposición del Estado sobre estas áreas es indudablemente extensa, y la sabiduría de cualquier selección particular dentro del análisis de la posibilidad (*spectrum*) no es para ser decidida por nosotros . . . a pesar de que en el presente caso hay prueba que el apelante ha hecho uso de narcóticos en Los Ángeles, el jurado fue instruido que ellos podían declarar al apelante culpable aun en caso de no creer dicha prueba. El acusado podía ser declarado culpable, les fue informado, si encontraban simplemente que su '*status*' o 'condición crónica' era una de 'ser adicto al uso de narcóticos. . . '.''

"Este estatuto [Sec. 11721 del California Health and Safety Code] no es uno que castiga a una persona por el uso de narcóticos, por su compra, venta, o posesión, o por la conducta antisocial o desordenada que puede producir dicho uso. No es siquiera una ley que intente proveer o requiera tratamiento médico. Más bien, estamos tratando con una ley que hace del '*status*' del adicto a narcóticos un delito, por el cual el infractor puede ser enjuiciado 'en cualquier momento antes de que se reforme'. La Corte Suprema de California ha dicho que una persona puede ser continuamente culpable de este delito aunque haya o no haya usado nunca o estado en posesión de cualquier narcótico dentro del Estado, y aunque haya o no haya sido culpable de cualquier conducta antisocial allí. . . . Ante este Tribunal, el consejero legal del

Estado ha reconocido que el adicto al uso de drogas es un enfermo. Por cierto parece su enfermedad una que puede ser contraída inocente o involuntariamente. Sostenemos que la ley de un estado que reduzca a prisión a una persona así condenada como un criminal, a pesar de no haber tocado nunca droga narcótica dentro del Estado o no haber sido culpable de una conducta irregular en dicho sitio, inflige un castigo cruel e inusitado en violación de la Enmienda Catorce . . .''

Las decisiones sobre cuestiones constitucionales en el Derecho penal tienen cierto aspecto teórico que prevalece, como una generalidad extraída de una norma de superior categoría, sobre la variedad de las circunstancias delictivas de unos u otros casos. Empero, hay decisiones que obligan más que otras a un riguroso escrutinio de los fundamentos, de los hechos, para determinar su alcance.

Es indudable que en el caso de *Robinson,* lo que decide a la Corte Suprema de los Estados Unidos a examinar la lesión constitucional, es el hecho de haberse declarado culpable a un ciudadano porque su *"status"* o "condición crónica" es una de ser un adicto al uso de drogas, después de haberse admitido que la narcosis es una enfermedad. El hombre que padece esta enfermedad está obligado a un uso compulsivo de la droga que no puede ser controlado por las convicciones morales de la ejemplaridad ni por las inhibiciones sociales de la civilidad. Se trata, quizás, de una de esas descompensaciones volitivas que crea el "miedo" psicológico, en su sentido criminógeno estricto, que circunda al hombre contemporáneo. Es conveniente consignar a renglón seguido que la decisión no rebaja el sistema de prohibiciones uniformes del Código Modelo seguido por nuestra propia legislación, en cuanto al uso comercial, propiamente dicho, a la compra, la venta, la posesión de los narcóticos.

El razonamiento ordenado de la decisión se puede destacar de la siguiente manera: El acusado fue condenado por ser su *"status"* o "condición crónica" la de un adicto a drogas, de

acuerdo con un estatuto que no castiga a una persona por el uso de narcóticos, su compra, venta o posesión, o por alguna conducta antisocial, desordenada, que sea resultado del negocio de drogas, ni que siquiera intente proveer o requerir tratamiento médico. La disposición estatutaria comprendida en esta decisión es aquélla que hace del *status* o condición de ser un adicto a drogas un delito por el cual el adicto puede ser perseguido en cualquier tiempo antes de reformarse. Se ha admitido que la narcosis es una enfermedad, que incluso puede ser contraída inocente o involuntariamente. "Sostenemos que la Ley de un estado que ponga en prisión a una persona así enferma, como un criminal, aun cuando no haya nunca usado ninguna droga narcótica dentro del Estado o haya sido encontrado culpable de una conducta ilegal en dicho sitio, le inflige un castigo cruel e inusitado en violación de la Enmienda Catorce. No hemos olvidado que los males que crea el vicio sostenido por el tráfico de narcóticos ha sido una grave preocupación para nuestro gobierno. Hay, según hemos dicho, un sinnúmero de puntos de partida desde los cuales se pueden atacar legítimamente estos males. Estamos tratando en este caso únicamente con la disposición peculiar de una ley local particular en la forma en que hasta ahora ha sido interpretada por las Cortes de California."

La opinión concurrente del Juez señor Douglas tiene una gran utilidad en el esclarecimiento de algunos de los puntos salientes de la decisión de la mayoría. Aparte de la dramática exposición del problema de la droga en un gran orden humano, que cubre desde los niños de algunos minutos de nacidos a los cuales hubo que suministrarle drogas tranquilizadoras por ser ya adictos a la heroína, droga utilizada por sus madres durante el embarazo, hasta las psicopatologías adultas de los adictos decrépitos con los rasgos más deseables del carácter humano deteriorados, dominados por un "miedo" imaginario que algunas veces llega hasta la locura, la opinión concurrente hace claro que la salvedad constitu-

cional que. proscribe los castigos crueles e inusitados no impide el confinamiento del adicto, bien se le considere como un enfermo que necesita curación o· como un enfermo que constituye un peligro para la sociedad; que ningún caso dicho confinamiento debe ser en virtud de una sentencia criminal y cualquier sentencia criminal impuesta a un adicto a drogas interfiere con su mejor tratamiento médico y su rehabilitación y la práctica de la sentencia y la reclusión de tipo penitenciario deben ser abolidas; que la única forma de enfrentarse a la condición criminógena de un adicto es considerándolo como un enfermo y toda corrección en beneficio suyo o del Estado debe ser mediante un procedimiento de naturaleza civil.

La glosa primera en turno al caso de *Robinson* destaca tres resultados para la ciencia penal: (1) Habiéndose declarado que el adicto a drogas es un enfermo, cualquier estatuto que provea sanción penal para el adicto resulta inconstitucional por ser una violación de la Enmienda Catorce que prohibe los castigos crueles e inusitados. Recent Cases III-I U. Pa. L. Rev. 122 (1962); notes—John E. Bagalay, Jr., 41-3 Texas L. Rev. 444, cita a la pág. 446 (1963); notes—Diane F. Vockey, XXXVII Tul. L. Rev. 106, cita precisa a la pág. 124 (1962); (2) que el hecho de ser un adicto a drogas, puede resultar una defensa válida en favor del adicto cuando se sorprenda a éste haciendo "uso", "poseyendo" o "transportando" una droga, si dichas operaciones resultan incidentales a su propio uso: *The Supreme Court 1961 Term*—76-1 Harv. L. Rev. 146 (1962); Helen Silving —*La Filosofía de la Parte Especial de un Código Penal*, XXXIII—I Rev. Jur. U.P.R. 37 (1964); *"Recent Cases"*— U. Pa. L. Rev., *supra*, cita precisa a la pág. 126.

En cuanto a este aspecto de la defensa válida, sería conveniente detallar un poco los criterios, porque el mismo plantea un delicado problema de semántica jurídica y la interpretación de una regla constitucional, que si no se analiza

con detenimiento puede conducir al absurdo. Hablando de la prohibición estatutaria sobre el "uso" y el "uso propio" sancionado en el caso de los adictos que estamos estudiando, la glosa del caso que aparece en Harvard Law Review, *supra*, cita precisa a la pág. 146 dice así: "La principal diferencia nos parece ser el grado de especificación (*particularity*) que se requerirá en la acusación y la prueba que se necesitará de ciertos aspectos relacionados con el tiempo y el sitio del uso. Más aún, suponiendo que el criterio de la mayoría no requiera la eliminación del 'uso' como un delito separado, por lo menos se puede argüir que el criterio indica que a un acusado se le debe permitir presentar su condición de adicto como una defensa ante una acusación por dicho uso, pues, de otra forma, el estado estaría castigando el uso propio de una manera indirecta." El comentario publicado en University of Pennsylvania Law Review, hablando sobre el "uso" y otras prohibiciones estatutarias establecidas contra la "posesión" o "estar bajo la influencia de narcóticos" se expresa en los siguientes términos: "Si la enfermedad de la insania o los actos compulsivos de una persona insana no pueden ser castigados, constitucionalmente, parece inconsistente prohibir el castigo de la enfermedad que padece el adicto a drogas y permitir el castigo del adicto a drogas por el 'uso' 'posesión' o el hecho de estar bajo la influencia de narcóticos, cuando su único propósito para tal uso, posesión o influencia es la inmediata satisfacción de su propio hábito. El Juez señor White [en su opinión disidente] reconoció la inconsistencia de distinguir entre el *status* del adicto a drogas y el uso por el adicto de los narcóticos pero expresó su duda que la Corte [la Corte Suprema de los Estados Unidos] quisiere prohibirle a un estado castigar tal uso. Sin embargo, si las restricciones legales para obtener curación y la falta de facilidades, eliminara efectivamente los caminos del tratamiento adecuado o la satisfacción de la sed insaciable que sufre el adicto, la posesión y el uso ilegales

aparece ser su única alternativa realista. Castigar tales actos compulsivos sería, entonces, equivalente a castigar al enfermo por ser un adicto a drogas" (págs. 126–127). La doctora Helen Silving de la Universidad de Puerto Rico, escribiendo en la Revista Jurídica de la Universidad de Puerto Rico, sobre la misma cuestión, añade: "La 'posesión de narcóticos', a menos que la cantidad poseída indique el propósito de venta, es otro delito que merece ser descartado. En realidad, en cuanto a 'adictos' esto está implícito en la reciente decisión del Tribunal Supremo de los Estados Unidos, la cual determina que el delito de 'narcomanía' es inconstitucional, y esta decisión debe ser interpretada racionalmente con vista a sus connotaciones sociales en vez de conceptualmente, es decir como un mero ejercicio de semántica legal. En lo relativo a personas 'no adictas', una proscripción de 'posesión' no relacionada con el uso presente y futuro 'en público' o de otra manera afectando a otras personas (corrupción de otras personas) puede decirse que constituye una indebida invasión de la privacidad humana."

3—El tercer resultado para la ciencia penal del caso de *Robinson* es la distinción, que en el propósito penal se establece, entre los culpables de operar un negocio nefasto y la inculpabilidad de los adictos a drogas. John E. Bagalay, Jr., escribiendo en Texas Law Review, *supra*, se expresa así: "Si comenzamos asumiendo que el adicto a drogas es un enfermo y dicho adicto no debe ser tratado como un criminal, entonces, en todo lo que a la ley concierne, nuestra atención debe apartarse de la víctima, que es el adicto, para fijarse en la conducta de aquellos que han hecho un negocio productivo del tráfico ilícito de narcóticos. No queremos más legislación regulando el tráfico ilícito de narcóticos. Si el problema continúa sin solución, entonces la dificultad está, o en un cumplimiento inefectivo de las leyes existentes o en un enfoque inadecuado de problema de los narcóticos y de los adictos a drogas en general. Mientras el aumento del

personal y un más riguroso cumplimiento de las leyes de narcóticos existentes sigan siendo el clamor, los resultados de los esfuerzos británicos para controlar el tráfico de narcóticos indican que tal medida aisladamente no puede ser la solución más efectiva. El enfoque británico es que el adicto a drogas es un enfermo. Al adicto no se le obliga a buscar su droga a través de cualquier conducto ilícito; por el contrario, la puede obtener . a un costo mínino a través de un conducto médico cuidadosamente reglamentado. Este método tiene la ventaja de hacer desaparecer los estímulos que mueven la criminalidad del adicto y . de aunar el uso de la droga a un tratamiento médico. El resultado en Inglaterra ha sido una reducción tanto en la criminalidad de los adictos, como en el número de adictos a las drogas. En el caso principal (*Robinson* v. *California*) la Corte [Corte Suprema de los Estados Unidos], se ha puesto correctamente en línea con la solución británica. Su doctrina además, resulta consistente con las conclusiones, por un lado, del comité conjunto del American Bar Association y la American Medical Association, y por el otro, con las del Sub Comite de Mejoras al Código Criminal federal del Senado [Senado de los Estados Unidos]. El impacto. de esta decisión parece estar dirigido a los estados para una más efectiva y humanitaria consideración del adicto a drogas y para servir como una advertencia general que ningún estado puede constitucionalmente ignorar los descubrimientos de la ciencia médica en la interpretación de su ley penal." (Págs. 447–448.)

Como se ve, el debate está hoy planteado entre la innovación de la regla inglesa que preconiza el carácter patológico del problema, considerando el adicto a drogas como un enfermo e incluso legaliza el negocio vedado de drogas para evitar los crímenes cometidos por los adictos mientras se encuentran bajo la terrible necesidad de usar la droga y la regla ortodoxa que preconiza el carácter volitivo del acto, considerando el adicto a drogas como un delincuente e incluso

acepta como la mejor solución el rigor policial. En su opinión concurrente, en el caso de *Robinson*, el Juez señor Douglas acepta la sabiduría de la regla inglesa, y en este caso, nuestro perito médico, doctor Ramón Fernández Marina, recomienda, como la principal solución para controlar la propagación del vicio y procurar la recuperación de los adictos, la legalización del tráfico ilícito de las drogas narcóticas.

El precedente inmediato de la prohibición de la industria licorera, con su impresionante complejo de una alta criminalidad, parece indicar que la única forma efectiva de enfrentarse al problema contemporáneo de la narcomanía es la legalización total del negocio prohibido, tal y como se hizo en el caso de la industria licorera. De lo contrario, siempre quedaremos expuestos al riesgo máximo de los cuarenta mil adictos por cada generación, problema que por su magnitud, es capaz de desorganizar toda la estructura educativa, sanitaria o policial de nuestro Estado. La prueba médica demuestra que mientras el adicto no consigue la droga, está en un vehemente estado de furia criminógena, o bajo la depresión de un miedo psicológico, denso, durante los cuales es capaz de cometer cualquier crimen, si no logra compensar la deficiencia volitiva ingiriendo la droga. Como es sabido, la ciencia penal contemporánea empieza a considerar el "miedo", como un eximente de la culpa penal, como una nueva inculpabilidad, pues al momento de oscurecerse el claustro social del hombre, ceden los atributos luminosos de la razón humana y hay una regresión al terror natural. Después de ingerir la droga, se encuentra en una euforia, que si bien no constituye el mejor balance de la conducta ordenada y reflexiva, por lo menos controla las latencias criminógeneas y libra del "miedo", este miedo cerval, este recelo que crea la mística del "robot" en la conciencia del hombre joven.

En el caso de Puerto Rico, tal legalización está erizada de dificultades debido a la amplitud extraterritorial que tiene

nuestra actual asociación con los Estados Unidos de América. Por la naturaleza del problema, hay aquí cuestiones de política del Estado que trascienden los límites de nuestra autoridad judicial y deben ser referidas a la autoridad legislativa de nuestro pueblo; pero, quedan siempre aquellos aspectos que son irremisiblemente nuestros, como es determinar si la imposición de una pena viola las deferencias humanas de nuestro instituto constitucional.

En la vista del recurso ante nos quedó claramente establecido el hecho, que el peticionario, al momento de ser sentenciado, era un adicto a drogas, incluso un adicto recurrente, y por lo tanto, debió ser considerado como un enfermo y no como un delincuente, no sólo por los resultados doctrinales de la cuestión constitucional examinada, sino también por la disposición expresa del Art. 60(o) de la Ley Núm. 48 de 18 de junio de 1959, conocida por la Ley de Narcóticos de Puerto Rico, que dispone: "Ninguna persona que sea sometida al tratamiento compulsorio [por encontrarse que es un adicto a drogas] que se autoriza en este artículo será considerado como un infractor de esta ley y la orden del tribunal ordenando su reclusión en una institución no se considerará, bajo ninguna circunstancia, como una convicción o sentencia criminal."

El habérsele sentenciado como un delincuente, tal vez obedeció al criterio predominante que el hecho de tener en su "posesión" la droga narcótica conocida por marihuana lo hacía culpable de una infracción al Art. 29 de la Ley de Narcóticos nuestra, que prohibe la "posesión" de dicha droga, sin especificar ni distinguir entre una "posesión" para *uso ajeno* con fines de lucro ilícito dentro del negocio clandestino de drogas y la posesión para el "uso" propio que adquiere incidentalmente el adicto. La glosa que hemos examinado en torno a la decisión en el caso de *Robinson* nos ha convencido que debemos establecer una diferencia entre el "uso", la "posesión", constituya un *status* patológico o un acto inten-

cional, del adicto a drogas y el "uso" o "posesión" del traficante de drogas. Como bien se ha advertido por los comentaristas condenar a un adicto por la posesión o cualquier otro acto incidental a su urgencia patológica, es castigarlo indirectamente por ser un adicto, un habituado sin posible control de su intención criminal, un enfermo.

Claro debe quedar, que, cuando la prueba establezca que el acusado es un adicto a drogas, cualquier posesión o dominio de un narcótico para su propio uso, no constituye una infracción al Art. 29 de la Ley de Narcóticos de Puerto Rico que se refiere al traficante de drogas que opera en persona ajena y si concede causa al procedimiento judicial especial para adictos del Art. 60 de la misma ley que se refiere al uso del narcótico por el propio adicto. Comprendemos la situación difícil, que en algunos casos, puede crear la necesidad de determinar si se trata de una posesión para fines del tráfico ilegal o para uso propio del adicto. Mas tal dificultad puede obviarse en virtud de las investigaciones especiales de agentes encubiertos o con un descubrimiento más metódico de las circunstancias que rodean cada caso.

Lo mismo podemos decir en cuanto al problema del confinamiento especial provisto por el Art. 60. Si bien tal confinamiento especial requiere un tipo de reclusión distinto al que brinda nuestro sistema carcelario, no creemos difícil aislar una parte de nuestras penitenciarías, o establecer un servicio de dispensario para aquellos casos que puedan tratarse mediante la reducción de la dosis, con el fin de darle cumplimiento a la ley. Parece existir cierto pesimismo en cuanto al por ciento bajo de rehabilitación de los adictos; pero, este asunto es tan complejo, que cuanto más bajo resulte el por ciento de rehabilitación, más alto será el por ciento de prevención de crímenes, y por lo tanto, más urgente hacer viable el confinamiento especial que requiera el Art. 60. De todos modos, este aspecto del problema está fuera de nuestra competencia.

Por las razones expuestas, se deja sin efecto la sentencia criminal dictada por el Tribunal Superior de Puerto Rico, Sala de San Juan, en el caso G-61-548 y se le ordena a dicho Tribunal ver nuevamente el caso bajo las disposiciones del Art. 60 de la Ley de Narcóticos de Puerto Rico.

.    .    .    .    .    .    .

Hasta aquí la opinión que no mereció la aprobación del Tribunal. Notamos que para llegar a una conclusión distinta, el ilustrado ponente toma los hechos que desfilaron en el juicio anterior al procedimiento de hábeas corpus y no los hechos que desfilaron en la vista del hábeas corpus, que son los únicos a ser considerados en esta resolución: *Fay* v. *Noia*, 372 U.S. 391, 9 L.Ed.2d 837 (Brennan) (1963), cita precisa a las págs. 423–425 U.S., 859–860 L.Ed. Ésta es la última exposición doctrinal más confiable sobre la independencia procesal del recurso de *hábeas corpus* de todo trámite criminal anterior. Una acotación marginal, bastante incompleta, sobre los hechos probados durante la vista del *hábeas corpus*, no le quita el relieve dramático de la primera exposición de los hechos que contiene la opinión. Sin embargo, si en la primera vista queda establecido el hecho de la posesión, dentro del significado que esto tiene en el tráfico ilegal de drogas, en la vista del *hábeas corpus* lo que queda establecido es el hecho categórico que el peticionario es un adicto, dentro del significado que esto tiene en el Código Modelo y el confinamiento especial provisto por el Art. 60 de la Ley de Narcóticos de Puerto Rico.

Notamos asimismo que la mayoría de la jurisprudencia citada por el ilustrado ponente no tiene concordancia con el Código Modelo, que es el que rige en Puerto Rico—por ejemplo—, *Browne* v. *State*, 129 N.W.2d 175 (Wilkie) (1964), cita precisa a la pág. 179; *State* v. *Brown*, 130 N.W.2d 760 (Hallows) (1964), cita precisa a la pág. 761; *Salas* v. *State*, 365 S.W.2d 174 (Morrison) (1963), cita precisa a la pág. 175, en cuyo caso, se resolvió, contrario a

la tesis sostenida por la opinión de la mayoría, que un adicto no puede ser condenado bajo la Ley de Drogas; *Ex Parte Rogers*, 366 S.W.2d 559 (Woodley) (1963), cita precisa a la pág. 560, en cuyo caso, también se resolvió, contrario a la tesis sostenida por la opinión de la mayoría que un adicto no puede ser condenado bajo la Ley de Drogas; *People* v. *Davis*, 188 N.E.2d 225 (Klingbiel) (1963) cita precisa a las págs. 226–227 resuelve que un estatuto que considere castigable estar bajo la influencia o ser un adicto a drogas, es inconstitucional; *Martínez* v. *State*, 373 S.W.2d 246 (Woodley) (1963) cita precisa a la pág. 247; *State* v. *Margo*, 191 A.2d 43 (per curiam) (1963) cita precisa a las págs. 44 y 45.—Los únicos casos que parecen tener concordancia con el Código Modelo, que es el que hace la distinción entre los traficantes y los adictos y el que rige en Puerto Rico son los siguientes: *Murray* v. *State*, 203 A.2d 908 (Horney) (1964) cita precisa a la pág. 911, es un caso de venta de heroína en tráfico legal corriente, en el cual se hace la distinción que si se tratara de un adicto no podría ser castigado, aunque podría ser recluido para tratamiento, lo mismo que en Puerto Rico; *State* v. *DaVila*, 183 A.2d 852 (Murphy) (1962) cita precisa a la pág. 854, es un caso de venta de heroína en el tráfico ilegal corriente, en el cual también se hace la distinción que si se tratara de un adicto no podría ser castigado, aunque podría ser recluido para tratamiento, lo mismo que en Puerto Rico; *State* v. *Walker*, 154 So.2d 368 (Hamiter) (1963) cita precisa a la pág. 372; *State* v. *James*, 169 So.2d 89 (Sanders) (1964) cita precisa a la pág. 92, no es un caso de adicto sino de traficante ordinario (posesión) que principalmente se convierte en un caso de registro ilegal; *State* v. *Bridges*, 360 S.W.2d 648 (Holman) (1962) cita precisa a la pág. 651 resuelve que una disposición penal que castiga por ser adicto al uso de narcóticos es inconstitucional.

El resultado de esta exposición doctrinal un tanto arbitraria es claramente negativo: Por encima de las disposiciones de nuestra Ley Núm. 48 de 18 de junio de 1959, conocida como la Ley de Narcóticos de Puerto Rico, un adicto a drogas, un enfermo, seguirá cumpliendo una sentencia criminal expresamente prohibida por nuestra Ley.

—O—

Voto separado del Juez Asociado Señor Santana Becerra, en el cual concurren también el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Belaval y Hernández Matos.

San Juan, Puerto Rico, a 30 de junio de 1963

La Ley Núm. 48 de 18 de junio de 1959 llamada Ley de Narcóticos de Puerto Rico contiene en su Art. 60—24 L.P.R.A. sec. 976 (*l*) —un procedimiento civil ante el Tribunal Superior que inicia el Secretario de Salud para recluir y aislar de la sociedad a los adictos a drogas.

Hasta donde sabemos ese procedimiento civil no se utiliza, y si se ha utilizado no lo ha sido en el grado mínimo necesario para afrontar el problema médico-social de la adicción.

Por el contrario al adicto, aquél que se le sorprende con la chapita ahumada de botella con residuos de heroína, la aguja y el cuentagotas, o a aquél que se le coge eufórico queriendo absorberse, más que fumarse, un cigarrillo de mariguana, se le ha venido tratando como un criminal corriente bajo las disposiciones del Art. 29 de la Ley.

Es cierto que la convicción tiene el efecto de aislar al adicto de la convivencia comunal, y que mientras cumple la condena se le da hasta donde un presidio lo permite, tratamiento contra la adicción, pero el individuo está aislado no como lo estaría el enfermo bajo el procedimiento civil del Art. 60, sino con la indignidad de una convicción criminal y todas sus demás consecuencias. Si la ciencia médica asegura

que un adicto a drogas es un enfermo, no se precisa, ni de una disposición constitucional conjurando el castigo cruel e inusitado ni de un fallo, *Robinson* v. *California*, 370 U.S. 660 para que un pueblo concluya por un innato sentido de cultura social, que ese adicto no debe ser maculado criminalmente.

La prueba que desfiló en el Hábeas Corpus ante nos me ha dejado convencido que estamos ante el caso de un adicto. Si es así, como lo creo que es, veamos cómo se expresa la medicina. El distinguido siquiatra Dr. Ramón Fernández Marina declaró contestando a una pregunta sobre cuáles son las características que presenta la adicción a drogas:

"Bueno, el adicto a drogas puede tener diferentes tipos de personalidad tanto física como psicológica pero hay una cosa fundamental en todos ellos que luego que experimentan el efecto de la . . . en estos casos generales son la heroína, pueden empezar con la morfina, o el dilaudito, la marihuana, etc. y cuando caen en las garras de la heroína que es la más terrible de todas ellas, pues, la característica es una necesidad compulsiva de utilizar la droga porque la ansiedad y el desasosiego físico que le cae es de tal naturaleza que no tienen en consideración, no pueden tener en consideración ninguna otra cosa que la obtención y el inyectarse la droga. Es decir que esta compulsión, esta necesidad a . . . terriblemente demandante de toda . . . y obnubilante de toda consideración moral, social, familiar, legal, de cualquier tipo que tiene el adicto a drogas, pues, es única en la psiquiatría. Digo, dentro de personas que no son psicóticas y en muchos casos hemos visto que la adicción a drogas lo que está tapando es una psicosis, una esquizofrenia y como la esquizofrenia es el no ser, el no pertenecer, el no sentirse humano, pues, utilizan los recursos de las drogas para permanecer pegados a la realidad."

Más adelante, contestando a la pregunta de si el adicto puede tener el control de sus actos en lo referente a la droga:

" . . . Pero hasta donde sabemos en psiquiatría cuando inferimos la conducta de un individuo de sus procesos mentales uno que está adicto a drogas no puede tener un juicio claro de la

percepción de la realidad para poder llevar a cabo un control adecuado de su conducta. Quiero decir con esto que el juicio, el enjuiciar, el ser juez, el juzgar un acto es la capacidad máxima del ser humano. Es lo que últimamente se desarrolla en la evolución de la psique, es la capacidad rara de enjuiciar. Por eso es que la función del juez en la sociedad es la más excelsa. Y estos individuos que están intervenidos en su fisiología y en su psicología por, primero por la compulsividad en su carácter psicológico y por la toxicidad de la droga, pues, evidentemente no pueden tener control sobre las funciones psicológicas que determinan su conducta, que determinan el control de sus actos sociales. Por lo tanto la contestación es no."

"Hon. Juez Belaval:

"¿Podrían distinguir entre el bien y el mal?

"Sí y no.

"¿Cuáles serían las circunstancias que condicionarían la conducta?

" . . . . El adicto a drogas por el efecto de su enfermedad psicológica y por su estado tóxico fisiológico no considera la seguridad, considera su satisfacción porque compulsivamente tiene que, como el niño, buscar esa satisfacción para sentirse tranquilo. Un infante, niño, no le importa si está enfermo de diabetes, por ejemplo, él come su azúcar porque no tiene conocimiento de que le da seguridad de vivir el ponerse a una dieta y aunque le haga daño el azúcar ese niño, pues, su juicio es tan infantil, podríamos decir, que se come el azúcar. Lo mismo le pasa al adicto a drogas, es tan grande la necesidad que tiene de salir del estado psicológico y fisiológico en que está que aunque pueda saber de que su seguridad peligra, su satisfacción es primordial a su seguridad porque todavía la enfermedad que tiene no puede posponer la satisfacción a la seguridad. Por lo tanto si ese es el estado psicológico y fisiológico del individuo no importa que pueda distinguir entre lo que es bueno y lo que es malo porque compulsivamente tiene que hacer las necesidades que le obliga su satisfacción."

" . . . Lic. Cruz:

"¿Una persona que esté en esas circunstancias que usted acaba de explicarnos, verdad, de la adicción, puede considerarse un enfermo, doctor?

"Por supuesto, es lo que estoy tratando de decir que es una psicopatología y una fisiopatología. Queriendo decir patología, enfermedad."

Más adelante, a la pregunta sobre si la conducta responde a un plan regular: ·

"Sí, evidentemente durante cierto período de tiempo el adicto fluctúa la necesidad que tiene de utilizar la droga, verdad, pero luego que cae ya la condición física de la necesidad física porque primero es una necesidad psicológica pero a medida que se va intoxicando que va el metabolismo envolviéndose y va la química del hígado envolviéndose y el sistema nervioso pues, entonces, ya es una necesidad fisiológica. Primero es psicológica y después es psicofisiológica. Es decir que cada vez se hace peor por eso es que necesita cada vez más cantidad."

" . . . De manera que si observamos desde ese punto de vista la conducta de un narcómano pues vemos que él está enfermo psicológicamente y está enfermo fisiológicamente pero que es una unidad que se llama ser humano que está funcionando en forma no adecuada."

De acuerdo con la ciencia médica que aquí habló a través del distinguido profesional Dr. Fernández Marina, el peticionario es un enfermo. Tan irresistible es la necesidad, primero sicológica y a manera que se intoxica sicofisiológica que ata al sujeto con la droga, y tan poderoso es el vínculo, que cuando al enfermo se le encierra como un delincuente según se ha venido haciendo, de múltiples maneras la droga logra romper las barreras del confinamiento y llega hasta él.

La opinión del Tribunal concede mucho énfasis e importancia a lo que hay en la decisión de *Robinson* que es obvio y nadie discute, y que sería así aunque no se hubiera emitido *Robinson*; que los Estados, y Puerto Rico en el caso nuestro, tienen facultad para perseguir criminalmente y declarar delito la posesión, uso tráfico, etc. de drogas. *Robinson* es más trascendente que eso, y aunque fue un estatuto de California que castigaba la adicción como tal lo que engendró esa decisión, estatuto que no existe aquí, tampoco la tras-

cendencia de *Robinson* está limitada a aquellas situaciones en que exista un estatuto como el de California anulado.

*Robinson* tiene valor dondequiera que el resultado sea que se está castigando criminalmente lo que resulta ser una enfermedad. Se castiga la enfermedad cuando se castiga el uso o la posesión como una manifestación de la enfermedad. Sería ignorar los dictámenes de la ciencia médica no comprender que ese uso y esa posesión son el mismo impulso irresistible sicológico y sicofisiológico que como expresó el facultativo vincula la droga al enfermo.

Ante la seriedad del problema, que viene preocupando hondamente a nuestra sociedad en las distintas esferas de expresión, me parece que el Tribunal debe llegar al fondo verdad del mismo, que no se resuelve circunscribiéndose a un análisis legalista de la decisión de *Robinson* y su enjuiciamiento doctrinal.

Haciendo un criminal de un enfermo no se salva el problema. Aunque el Tribunal por sí mismo no tiene el poder de dar el tratamiento ni ofrecer la cura, sí puede sentar la pauta jurídica que guíe hacia una solución del problema.

No estoy sosteniendo que el Art. 29 de la Ley de Narcóticos sea inconstitucional. Pero en la función del Tribunal de interpretar la ley, entiendo que debe interpretarse que el uso y posesión que él menciona no incluye, so pena de ilegalidad, el uso o la posesión de un adicto en mera satisfacción de imperativos sicológicos y fisiológicos que a no ser por su enfermedad no demandaría.

Por las consideraciones que expone el compañero Sr. Belaval en su opinión disidente en la cual concurro en todo, y por lo dicho, he disentido. Creo que el peticionario debe quedar aislado de la comunidad hasta su recuperación, pero no bajo una condena criminal que debería anularse.